Steven TRUJILLO; et al., Plaintiffs,

v.

CITY OF ONTARIO, A Municipal Corporation; et al., Defendants.

No. EDCV04–1015–VAP SGLX.

United States District Court, C.D. California.

April 14, 2006.

Peter Eliasberg (argued) and Ahilan Arulanantham of the ACLU of Southern California in Los Angeles, CA, and Della Bahan, Puja Batra, and Peter Bibring of Bahan & Associates in Pasadena, CA, for plaintiffs.

Bruce Disenhouse of Kinkle, Rodiger & Spriggs in Riverside, CA, for Defendants.

### AMENDED ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

PHILLIPS, District Judge.

Plaintiffs' and Defendants' Motions for Summary Judgment came before this Court for hearing on March 20, 2006. After reviewing and considering all papers filed in support of, and in opposition to, the Motions, as well as the arguments advanced by counsel at the hearing, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' and Defendants' Motions for Summary Judgment.

### I. BACKGROUND

Plaintiffs filed their Complaint on August 13, 2004, and their First Amended Complaint ("FAC") on October 28, 2004. Plaintiffs are officers of the City of Ontario Police Department ("OPD"). [FAC ¶¶ 3–9.] They allege that in 1996, Defendants secretly installed a video camera in the OPD's men's locker room. [*Id.* ¶¶ 1, 28–32.]

The Court granted Plaintiffs' Motion for Class Certification on April 14, 2005, certifying the following class: "[A]ll persons who were employed by the Ontario Police Department or volunteered for the Ontario Police Department, used the Department's men's locker room during the period in which the surveillance equipment was installed, and were recorded by the surveillance equipment." [April 14, 2005, Order Granting Plaintiffs' Motion for Class Certification at 13.]

Plaintiffs filed a Second Amended Complaint ("SAC") on September 29, 2005, adding Michael Thompson. [*Compare* SAC ¶¶ 15 and 30 *with* FAC ¶¶ 15 and 30.] The Second Amended Complaint alleges the following Claims: (1) violation of the Fourth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983; (2) violation of Article 1, Section 1 of the California Constitution; and (3) common law invasion of privacy.

On October 17, 2005, counsel entered into a Stipulation to Dismiss Defendant Joe Sifuentes with prejudice from this action.

On February 21, 2006, Plaintiffs filed a Notice of Motion For Partial Summary Judgment ("Pls.' Notice") and a Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls. Mem. P. & A."), and lodged concurrently a Statement of Uncontroverted Facts and Conclusions of Law. Plaintiffs move for partial summary judgment on liability against Defendants Brad Schneider, Michael Thompson, and the City of Ontario. [Pls. Notice at 2.] On March 6, 2006, Defendants filed an Opposition to Plaintiffs' Motion for Pretrial [sic] Summary Judgment ("Defs.' Opp'n"). Plaintiffs filed a Reply Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Reply") on March 13, 2006.

On February 21, 2006, Defendants filed a Notice of Motion and Motion for Summary Judgment and/or Summary Adjudication and a Memorandum of Points and Authorities in Support of Motion for Sum-

mary Judgment/Summary Adjudication of Issues ("Defs.' Mem. P. & A."). On March 6, 2006, Plaintiffs filed a Memorandum of Points and Authorities in Support of Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp'n") and a Statement of Undisputed Material Facts and Responses to Defendants' Statement of Undisputed Material Facts concerning Defendants' Motion for Summary Judgment. Defendants filed their Reply ("Defs.' Reply") on March 13, 2006.

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the moving party has the burden at trial, "that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331,

106 S.Ct. 2548. The burden then shifts to the non-moving party "and requires that party ... to produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial. ..." *Id.*; *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; Fed. R.Civ.P. 56(e).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

## III. UNCONTROVERTED FACTS

The following material facts have been adequately supported by the moving parties and are uncontroverted. They are "admitted to exist without controversy" for the purposes of these Motions.[1] *See* L.R. 56–3.

In 1996 and 1997, the OPD was located at 200 North Cherry Avenue. [Stipulation of Undisputed Facts and Stipulation as to Admissibility of Certain Documents for Motions for Summary Judgment and Partial Summary Judgment ("Stipulation") lodged on February 21, 2006.] In July 1996, OPD Officer Bret Larson ("Larson") filed a police report stating that his flashlight had been recently stolen from the men's locker room. [Stipulation.] The theft investigation was assigned to Defendant OPD Detective Brad Schneider ("Schneider"). [Stipulation.] In addition to the theft of the flashlight, Defendant

---

**1.** Defendants' Proposed Fact 15 is unsupported by the evidence. Defendants' Proposed Facts 3 and 18 are immaterial to the Court's resolution of the issues presented in these

Motions. Plaintiffs' Proposed Fact 36 is immaterial to the Court's resolution of the issues presented in these Motions.

Schneider had heard rumors of other thefts in the locker room. [Deposition of Brad Schneider ("Schneider Depo.") at 153:1–153:5.]

Sometime in 1996, as part of the investigation, Defendant Schneider arranged with Defendant Michael Thompson ("Thompson"), a non-employee of OPD and long time personal friend of Defendant Schneider, to have a surveillance camera ("the camera") installed behind a ceiling tile near one of the entrances to the locker room. [Stipulation, Schneider Depo. at 184:5–185:24, Deposition of Michael Thompson ("Thompson Decl.") at 10:11–11:19.] The camera was installed behind the tile in such a way that it was concealed from view. [Stipulation.] Defendant Thompson knew that the camera would record the male officers changing clothes in the locker room; however, he was unaware that the videotaping was "unlawful." [Deposition of Michael Thompson ("Thompson Depo.") at 13:15–13:17, 17:17–19:1, 40:5–41:1, 44:2–44:20.]

The camera was connected to a time-lapse video cassette recorder ("the VCR") located in the office of the Communications Sergeant. [Stipulation.] No one from the OPD attempted to obtain a warrant, or obtained a warrant, for covert or overt video surveillance of the locker room. [Stipulation.]

All sworn male officers below the rank of Lieutenant who worked out of the North Cherry Avenue building, as opposed to off-site locations such as the airport narcotics unit, had a locker in the men's locker room. [Stipulation.] While the locker room contained showers, toilets, urinals, and sinks, the camera recorded only the area around Larson's locker. [Stipulation.] Defendant Schneider placed a "bait" bag in the area of Larson's locker because it was an area furthest from the showers and bathroom area and was a central area where the officers mingled while in the locker room. [Schneider Depo. at 157:11–157:20.]

Defendant Schneider told the investigators from the Sheriffs' Department that he remembered putting the bait bag out over a single weekend, that nothing was taken, and he was not sure if another member of the OPD took over the investigation after he was promoted. [Declaration of Peter Eliasberg ("Eliasberg Decl.") at Ex. 4, 9–11 of 17 *in* Declarations in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pls.' Decl. in Opp'n").] Defendant Schneider never placed a tape from the VCR into evidence. [*Id.* at 12 of 17.]

Officers regularly changed, showered, and used the sinks, toilets, and urinals in the locker room, whereas the general public used restroom facilities located in the lobby of the building. [Stipulation.] Suspects, arrestees, and persons being questioned had no access to the locker room. [Stipulation.]

The locker room was self-contained and accessible through one of two doors. [Stipulation.] Persons in the hallway outside the locker room could not see into it, unless one of the doors was held open. [Stipulation.] Suspects, arrestees, and persons being questioned had no access to the hallway outside the locker room. [Stipulation.]

There were no signs in the locker room or anywhere else in the OPD North Cherry Avenue Building announcing that the locker room was subject to video, audio, or photographic surveillance. [Stipulation.] OPD employees were never informed by OPD management, either orally or in writing, that they might be subject to video, audio, or photographic surveillance in the locker room. [Stipulation.]

While OPD was in the process of moving out of the North Cherry Building, Officer

Dan Harris ("Harris") found a tape ("the tape") in the VCR containing recorded images of the locker room and watched it in April or May 2003. [Stipulation.] Harris did not inform anybody at the OPD about the tape until late August or September 2003, when he informed Plaintiffs Trujillo and Jeff Quon ("Quon"). [Declaration of Daniel Harris ("Harris Decl.") at ¶ 3, Declaration of Steven Trujillo ("Trujillo Decl.") at ¶ 3, Declaration of Jeff Quon ("Quon Decl.") at ¶ 3 *in* Pls.' Decl. in Opp'n.] Messrs. Quon, Harris, and Trujillo did not inform anyone else in the OPD about the tape until February 2004, which is when its existence became generally known at OPD. [Harris Decl. at ¶ 3, Trujillo Decl. at ¶ 4, Quon Decl. at ¶ 5, Declaration of Scott Anderson ("Anderson Decl.") at ¶ 5 *in* Pls.' Decl. in Opp'n.] Members of the Ontario Police Officers Association, the Ontario Police Management Group, and a representative of the Department watched the tape. [Stipulation.]

The tape contains frames with the following date stamps: 11/14/96, 12/16/96, 12/17/96, 12/18/96, and 12/19/96. [Stipulation.] The tape depicts the same portion of the locker room throughout, and displays several officers within the OPD in various states of undress. [Stipulation, Trujillo Decl. at ¶ 3 *in* Declaration and Exhibit in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Decl. & Ex.").]

The North Cherry Avenue building had three floors: The main floor, which contained the lobby; the basement, which contained the locker room; and a partial floor above the main floor, which contained the emergency operations center. [Trujillo Decl. at ¶ 4 *in* Pls.' Decl. & Ex.] The general public had unimpeded access to the lobby only, which contained a sitting area and restrooms. [*Id.*] To gain access to other parts of the building, employees and non-employees of OPD had to enter through locked glass doors. [*Id.*] Non-employees of OPD had to be buzzed through the doors by an OPD employee and escorted throughout the building. [*Id.*] The general public had very little access to the other areas of the building, especially the locker area. [*Id.* at ¶¶ 4–5.] Non-employees of OPD might enter the locker room to perform maintenance functions or to use the facilities when performing services in the communications room. [Ex. C, Deposition of Robert Bernhard ("Bernhard Depo.") at 14:13–15:12 *in* Declaration of Bruce Disenhouse ("Disenhouse Decl.").]

At least one female officer was permitted to use the male locker room; however, she took precautions to make sure that no men were present in the locker room before she entered and that no one would enter the locker room while she was changing. [Declaration of Kathy Janzen at ¶ 3 *in* Pls.' Decl. in Opp'n.]

The following are less intrusive methods that could have been used to attempt to recover the flashlight or investigate the theft of a flashlight and other items from the locker room: (1) sending out a memorandum requesting return of the flashlight; (2) having the shift officer check each officer's flashlight at the beginning of the shift; (3) placing a bait item coated with "ultraviolet" powder to detect who took the bait item; and (4) if there was an identified suspect, setting a bait item in the locker room before the suspect was to enter and checking the locker room immediately after the suspect left. [Anderson Decl. at ¶¶ 7–10, Trujillo Decl. at ¶¶ 9–12 *in* Pls.' Dec. & Ex.]

During the relevant time period, Defendant Tony Del Rio ("Del Rio") was a Lieutenant in the OPD. [Ex. F, Deposition of Tony Del Rio ("Del Rio Depo.") at 16:16–16:24 *in* Disenhouse Decl.] Defendant Lloyd Scharf was the Chief of Police for

the City of Ontario during the relevant time period. [Deposition of Lloyd Scharf ("Scharf Depo.") at 21:16–21:23.] Defendant City of Ontario ("City") is a municipality. [SAC ¶ 10.]

Plaintiffs Scott Anderson ("Anderson"), Robert Bernard ("Bernard"), and Craig Pefferle ("Pefferle") filed a tort claim against all Defendants except Michael Thompson on July 15, 2004. [Ex. B *in* Disenhouse Decl.] Plaintiffs Trujillo, Quon, Craig Ansman ("Ansman"), and Will Rivera ("Rivera") filed tort claims against all Defendants except Michael Thompson on August 23, 2004, and Plaintiffs Trujillo and Quon filed applications for permission to file a late claim pursuant to Government Code § 911.4 on the same day. [*Id.*]

Each named Plaintiff believed that they would not be secretly video taped while in the locker room.[2] [Anderson Decl. at ¶ 4, Declaration of Craig Ansman ("Ansman Decl.") at ¶ 4, Declaration of Robert Bernhard ("Bernhard Decl.") at ¶ 4, Declaration of Craig Pefferle ("Pefferle Decl.") at ¶ 4, Quon Decl. at ¶ 4, Declaration of Will Rivera ("Rivera Decl.") at ¶ 4, Trujillo Decl. at ¶ 6 *in* Pls.' Decl. and Ex.]

## IV. CONTROVERTED FACTS

Defendants have presented evidence that Defendant Del Rio did not provide the camera for the search and was unaware of the covert video surveillance until it was generally known; however, Plaintiffs have presented sufficient evidence controverting Defendants' evidence. [*Compare* Ex. F, Del Rio Depo. at 79:2–79:14, 83:2–83:21, 102:15–18 *in* Disenhouse Decl. *with*

Anderson Decl. at ¶ 4, Ansman Decl. at ¶ 3 *in* Pls.' Decl. in Opp'n.]

Defendants have also presented evidence that Defendant Scharf did not authorize or have knowledge of the covert video surveillance until after it was publicly known; however, Plaintiffs have presented sufficient evidence to controvert Defendants' evidence. [*Compare* Scharf Depo. at 52:4–52–13 *with* Schneider Depo. at 95:14–96:3, 96:7–96:19, Deposition of Patrick McMahon at 26:1–26:16, Scharf Depo. at 24:23–25:15, 55:24–55:6, 74:23–74:25, 116:17–117:3, 123:8–123:17, Deposition of Eliseo Sifuentes, Jr. at 50:24–51:6, 51:9–51:19.]

## V. DISCUSSION

### A. Violation of the Fourth Amendment

The Fourth Amendment provides the people a right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." [3] U.S. Const. amend. IV. The seminal case interpreting the Fourth Amendment, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), held the following:

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

**2.** While this fact was not presented in Plaintiffs' Statement of Undisputed Facts and Conclusions of Law as part of their Motion, it was included in Plaintiffs' Statement of Undisputed Material Facts and Responses to Defendants' Statement of Undisputed Material Facts as part of their Opposition to Defendants' Motion. Defendants have not objected to this proposed fact.

**3.** It is a well-settled principle of constitutional law that the Fourth Amendment applies to state action through the Fourteenth Amendment. *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (citing *Elkins v. United States*, 364 U.S. 206, 213, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)).

*Id.* at 351–52, 88 S.Ct. 507 (citations omitted). Justice Harlan aptly defined the test, in his concurring opinion, concerning whether a person is protected by the Fourth Amendment: A person must have a subjective expectation of privacy and the expectation must be one that society is prepared to recognize as reasonable. *Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring), *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). "The test of legitimacy is not whether the individual chooses to conceal assertedly private activity, [r]ather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 182, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

### 1. Subjective Expectations of Privacy

■ Plaintiffs contend that they had a subjective expectation of privacy because by using a non-public locker room for private conduct—showering, changing clothes, and using the toilets and urinals—they demonstrated their desire to perform these activities privately. [Pls.' Mem. P. & A. at 5.]

Defendants assert that Plaintiffs have failed to present evidence that they took actions to preserve their privacy from other people while in the communal locker room. [Defs.' Opp'n at 9.]

One has a subjective expectation of privacy if one has taken efforts to preserve something as private. *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (holding that placing an object in an opaque bag and placing the bag above your seat while on a bus is sufficient to establish a subjective expectation of privacy) (quoting *Smith,* 442 U.S. at 740, 99 S.Ct. 2577); *United States v. Nerber,* 222 F.3d 597, 603 (9th Cir.2000) (finding a subjective expectation of privacy in a hotel room when a person closed the door, drew the blinds, and exercised dominion in the room).

Here, Plaintiffs have presented sufficient evidence that they performed activities such as changing clothes and showering in the locker room and had a subjective expectation of privacy to be free from covert video surveillance. [Stipulation; Anderson Decl. at ¶ 4, Ansman Decl. at ¶ 4, Bernhard Decl. at ¶ 4, Pefferle Decl. at ¶ 4, Quon Decl. at ¶ 4, Rivera Decl. at ¶ 4, Trujillo Decl. at ¶ 6 *in* Pls.' Decl. and Ex.] That Plaintiffs chose to perform these activities in an area specifically designed to protect their privacy instead of a public area establishes that they had taken measures to preserve these activities as private.

Defendants argue that Plaintiffs failed to take actions to protect their private activities because they "freely changed clothes" in the presence of others, but that fact is immaterial. [Defs.' Opp'n at 9.] First, Plaintiffs took measures that significantly limited the number of people who could observe their private activities. Second, Defendants' argument defies logic: A person can have a subjective expectation of privacy that he or she will not be covertly recorded, even though he or she knows there are other people in the locker room; just as a person can have a subjective expectation that his or her home will not be searched by the authorities, even if he or she has invited friends into his or her home. Third, as will be discussed below, Plaintiffs are not asserting that they had a subjective privacy expectation from the other officers present in the locker room; rather, they subjectively expected that they were free from covert video surveillance.

Thus, Plaintiffs' use of a locker room to change clothes is sufficient to establish that no reasonable jury could find that they did not take measures to preserve their actions as private.

## 2. Objective Expectations of Privacy

■ Although there is no "talisman" that determines whether society will find a person's expectation of privacy reasonable, a court may consider (1) the nature of the search, (2) where the search takes place,[4] (3) the person's use of the place, (4) our societal understanding that certain places deserve more protections than others, and (5) the severity of the search. *See O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)[5]; *Nerber*, 222 F.3d at 599–602.

### a. Nature of the Search

Plaintiffs argue that Defendants address mere abstract concepts of privacy, rather than the specific and relevant question of whether or not Plaintiffs had a reasonable expectation that they would not be covertly videotaped while in the locker room. [Pls.' Opp'n at 3.]

The nature of the challenged state activity must be defined before the Court determines whether a person has a reasonable expectation of privacy from that activity, because the reasonableness of a search can differ according to the context. *Smith*, 442 U.S. at 741, 99 S.Ct. 2577, *O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492.

The nature of the intrusion can affect whether a person has a reasonable expectation of privacy; while a person may not have such an expectation from one type of search, he or she reasonably may expect privacy with respect to another. *See Katz*, 389 U.S. at 351–52, 88 S.Ct. 507 (holding that a person in a glass phone booth has a reasonable expectation that his or her conversation will not be intercepted, but he or she does not have a reasonable expectation that people will not view his or her actions while in the booth); *Bond*, 529 U.S. at 338–39, 120 S.Ct. 1462 ("When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another.... He does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner."); *United States v. Taketa*, 923 F.2d 665, 676 (9th Cir.1991) (finding that while a person might not have a general privacy interest in another person's office, he or she may have an expectation against being videotaped in it).

It is undisputed that the nature of the search here was covert video surveillance of the OPD's men's locker room. The camera was hidden from sight behind a ceiling tile with cables running to a VCR in the Communications Sergeant's Office. [Stipulation.] While the camera was located in the locker room, however, it only recorded the area around Larson's locker. [Stipulation.]

Thus, the issue before the Court is whether Plaintiffs had a reasonable expectation of privacy from covert video surveillance, not whether they had a reasonable expectation of privacy in general while in the locker room.

### b. Place of Search and Plaintiffs' Use of the Place Searched

Plaintiffs assert that they had a reasonable expectation of privacy against covert

---

4. While the Fourth Amendment "protects people rather than places, ... 'the extent to which the Fourth Amendment protects people may depend upon where those people are.'" *Nerber*, 222 F.3d at 599 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)), *United States v. Gonzalez*, 328 F.3d 543, 547 (9th Cir.2003).

5. A court may consider the intentions of the Framers of the Fourteenth Amendment; neither party here, however, raises such an argument. *O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492.

video surveillance while in the locker room because common sense dictates that while minimal intrusions of privacy are expected in a locker room, no person could reasonably expect to be secretly videotaped. [Pls.' Mem. P. & A. at 6.] Plaintiffs argue that a locker room is a non-public area used for private activities of showering, changing clothes, and using the toilets and urinals. [*Id.* at 5.]

Defendants respond that Defendants Schneider and Thompson did not violate Plaintiffs' Fourth Amendment rights because Plaintiffs had a diminished, if any, expectation of privacy while in the locker room. [Defs.' Opp'n at 4, Defs.' Reply at 3.] Defendants argue that the need for institutional security at a police station belies Plaintiffs' "common sense intuition" argument for the reasonability of Plaintiffs' expectation of privacy. [Defs.' Opp'n at 5–7.]

Defendants also argue that (1) the continual flow of visitors and fellow employees in the unlocked locker room makes any expectation of privacy unreasonable, (2) while Plaintiffs may hold a reasonable expectation of privacy in the contents of their lockers, society does not recognize an expectation of privacy for public areas such as communal locker rooms, (3) the locker room here is similar to locker rooms for school athletic teams, in which courts have stated there is no reasonable expectation of privacy, and (4) Plaintiffs routinely changed clothes in the presence of one another and overall police culture requires police officers to work in close quarters such that it would be unreasonable to believe that a locker room affords absolute

privacy. [Defs.' Mem. P. & A. at 8–9, Defs.' Opp'n at 7–8, Defs.' Reply at 4.]

Plaintiffs counter that while a locker room is not as exclusively private as a personal bedroom, it is not open to the public at large either. [Pls.' Opp'n at 2, Pls.' Reply at 1.] Plaintiffs assert that (1) they do not have a diminished expectation of privacy in a locker room just because they work at a police station, and (2) the communal nature of the locker room does not make their expectation of privacy from covert video surveillance any less reasonable, because there is a difference between solitude and privacy. [Pls.' Opp'n at 2–3, Pls.' Reply at 3–5.]

Here, Plaintiffs used the locker room to perform private activities such as changing clothes and showering and, indeed, the camera recorded Plaintiffs in various states of undress. Plaintiffs aptly concede that minimal intrusions are likely to occur and that they have no reasonable expectation of privacy from those intrusions. This does not diminish the reasonableness of a person's expectation to be free from covert video surveillance. See *Taketa*, 923 F.2d at 677 (finding that zones of privacy may be created within which people may not reasonably be videotaped, even when they do not own or control the place searched or might not be able reasonably to challenge a search at some other time or by some other means).[6] Plaintiffs need not have an expectation of total privacy in order to have a reasonable expectation that they will not be recorded surreptitiously while changing clothes in a locker room. *Id.* at 673 ("Privacy does not re-

---

**6.** In *Taketa*, the Court held that "[v]ideotaping of suspects in public places, such as banks, *does not violate the Fourth Amendment; the* police may record what they normally may view with the naked eye." 923 F.2d at 677. It could be argued that the covert video surveillance was lawful because Defendant Schneider could have stood and observed the same conduct that the camera recorded in the locker room. This argument, however, is premised on an overly broad interpretation of *Taketa*. *Taketa* establishes that the police may record what the public can normally observe. It has been established that the public could not observe Plaintiffs' conduct in the locker room.

quire solitude.... [A]ccess of others does not defeat [people's] expectation of privacy."); *Nerber*, 222 F.3d at 604 ("Even if one cannot expect total privacy while alone in another person's hotel room (i.e., a maid might enter, someone might peek through a window, or the host might reenter unannounced), this diminished privacy interest does not eliminate society's expectation to be protected from the severe intrusion of having the government monitor private activities through hidden video cameras.").

Defendants' assertion that the Supreme Court in *O'Connor*, 480 U.S. at 709, 107 S.Ct. 1492, found a reasonable expectation in a public employee's desk and cabinets, but "was not prepared to do so for the office itself," is an overstatement of the authority. [Defs.' Mem. P. & A. at 8, Defs.' Opp'n at 7.] In *O'Connor*, the Court held that the following:

> The Court of Appeals concluded that Dr. Ortega had a reasonable expectation of privacy in his office, and five Members of this Court agree with that determination.... On the basis of this undisputed evidence, we accept the conclusion of the Court of Appeals that Dr. Ortega had a reasonable expectation of privacy at least in his desk and file cabinets.[7]

480 U.S. at 718, 107 S.Ct. 1492. The holding in *O'Connor* does not support Defendants' assertion.

Moreover, even if the Supreme Court has not recognized a public employee's expectation of privacy in his office, it does not follow that this precedent will be extended to a locker room. Significant weight was given to the relationship between an office and the overall workplace, *id.* at 715–16, 107 S.Ct. 1492, which simply does not apply to the locker room here. Also, the conduct in a locker room is inher-

ently more private than that which takes place in a shared or private office.

Defendants also rely in vain on *Sacramento County Deputy Sheriffs' Assoc. v. County of Sacramento*, 51 Cal.App.4th 1468, 59 Cal.Rptr.2d 834 (1996), for the proposition that the locker room's presence in a police station diminishes Plaintiffs' expectation of privacy.

In *Sacramento County*, the Court found that there was a long history of diminished privacy expectations in prison because of security concerns, and that while the other cases focused on inmates or visitors, their holdings also applied to employees. *Id.* at 1478–83, 59 Cal.Rptr.2d 834. A shared office, out of public view, which was integral for recording and releasing inmates' property, was held not to be a private area partly because of the need for jail security. *Id.* at 1482, 59 Cal.Rptr.2d 834. Nevertheless, the court stated that "deputy sheriffs may have a reasonable expectation of privacy against being videotaped in certain portions of the jail, such as the deputies' bathroom or locker room (areas set aside for private activity)." *Id.*

While the facts here bear some similarity to those in *Sacramento County*—video surveillance in locations used by employees not visible to the public where personal belongings were stored—there is a fundamental difference between a locker room and a shared office. Indeed, the *Sacramento County* Court recognized this difference when it noted that deputies may have a reasonable expectation of privacy in bathrooms and locker rooms at a correctional facility.

Conveniently, Defendants do not address this language; instead, they analogize our case to *Sacramento County* by

7. The search in *O'Connor* involved an extensive search of a public employee's desk and cabinet within his office; thus, there was no reason for the Court to decide whether there was a reasonable expectation in his office generally. *O'Connor*, 480 U.S. at 713–14, 107 S.Ct. 1492.

using generalizations about institutional security because police stations and correctional facilities are both governmental institutions with close proximity to detained criminals. [Defs.' Opp'n at 6.] Moreover, Defendants discuss the search location at such a level of abstraction—police stations and correction facilities—rather than locker rooms and shared offices, that their reliance on *Sacramento County* is unfounded.

Defendants' final contention, that the police locker room is similar to a school athletic locker room where athletes have no reasonable expectation of privacy, is equally unpersuasive. [*Id.* at 8.] While courts have found that student athletes have diminished expectations of privacy because sports involve changing clothes and showering in locker rooms that do not have individual dressing rooms, no partition or curtains between shower heads, or doors on some toilet stalls, these cases involved athletes' reasonable expectations concerning consented-to drug testing and not covert video surveillance.[8] *See, e.g., Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Defendants cite this case for the proposition that the Supreme Court has held that there is no reasonable expectation of privacy in a locker room; the *Vernonia* decision does not so hold. [Defs.' Reply at 3.]

#### c. Societal Understanding of Place Searched

Plaintiffs assert that their expectation to be free from covert video surveillance has been recognized by state law. [Pls.' Mem. P. & A. at 8 n. 2.]

California has enacted several laws that prohibit or regulate conduct in locker rooms and restrooms. *See, e.g.,* Cal.Penal Code §§ 647(k), 653(n); Cal. Labor Code 435. While the laws concerning video surveillance in locker rooms were enacted after the relevant conduct in this case, they represent society's understanding that a locker room is a private place requiring special protection.

#### d. Severity of the Search

Plaintiffs assert there is sufficient authority holding that covert video surveillance constitutes an extremely intrusive search. [Pls.' Mem. P. & A. at 6.] Plaintiffs also assert that the intrusiveness of the search was compounded because (1) Plaintiffs were never notified that video surveillance, either covert or overt, would be conducted, and (2) the locker room was not open to suspects or arrestees. [*Id.* at 8.] Plaintiffs contend that while covert video surveillance may not be unreasonable in certain circumstances, it remains a highly intrusive search technique. [Pls.' Opp'n at 3, Pls.' Reply at 5.]

Defendants counter that the covert video surveillance was not excessive because (1) it was not per se unconstitutional, (2) there was no physical contact being made, (3) the camera did not rove, (4) it did not record the most private areas in the locker room, such as the showers, (5) the surveillance only lasted a few days, (6) it contained no audio, and (7) the tapes were not improperly distributed. [Defs.' Mem. P. & A. at 11–12, Defs.' Opp'n at 10–11, Defs.' Reply at 5.]

A court may take into account the severity of the intrusion when analyzing whether a person's expectation of privacy is reasonable. *Nerber,* 222 F.3d at 600. Here, the parties take drastically different posi-

---

**8.** The holding in *Vernonia* is also distinguishable from the facts here because the searches in *Vernonia* were motivated by "the government's responsibility . . . as guardian and tu-tor of children entrusted to its care," and were found to be minimally intrusive. 515 U.S. at 658, 665, 115 S.Ct. 2386.

tions on the severity of the covert video surveillance. Plaintiffs' position that covert video surveillance is particularly intrusive, however, is well supported by authority[9] and more persuasive. The Ninth Circuit has held specifically that "[h]idden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement. The sweeping, indiscriminate manner in which video surveillance can intrude upon us, regardless of where we are, dictates that its use be approved only in limited circumstances." *Nerber*, 222 F.3d at 603. Moreover, Defendants provided no notice to Plaintiffs that their conduct in the locker room might be recorded.

While Defendants' position that visual searches are less invasive than tactile searches is supported by authority, *Bond*, 529 U.S. at 338, 120 S.Ct. 1462 (quoting *Terry v. Ohio*, 392 U.S. 1, 17, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), it is a general proposition that fails to take into account the intrusiveness of recording of someone's actions. *See United States v. Gonzalez*, 328 F.3d 543, 548 (9th Cir.2003) ("A person has a stronger claim to a reasonable expectation of privacy from video surveillance than against a manual search."). The act of recording Plaintiffs while in the locker room with the "unblinking lens of [a] camera" distinguishes this search from an average visual search and is far more intrusive than a search of someone's property. *Taketa*, 923 F.2d at 677. Moreover, that the video surveillance here could have been conducted in a more intrusive manner, recording the officers in the showers, having an audio component, or having a

roving camera, in no way diminishes the severity of the search.

Thus, considering the totality of the circumstances and the relevant authority, Plaintiffs had a reasonable expectation of privacy from covert video surveillance while in the locker room.

### 3. Reasonableness of the Search

Defendants assert that even if Plaintiffs had a reasonable expectation of privacy, the covert video surveillance was constitutional because it was a reasonable search by an employer under *O'Connor*. [Defs.' Mem. P. & A. at 10, Defs.' Opp'n at 9, Defs.' Reply at 4.] Defendants argue that Defendants Schneider's and Thompson's conduct was necessary to maintain institutional security and the integrity of OPD because it was prompted by the theft of Larson's flashlight. [Defs.' Mem. P. & A. at 11, Defs.' Opp'n at 10.]

Defendants also assert that there is no evidence to establish that Defendants Del Rio or Scharf had personal knowledge or were in any way involved with the search. [Defs.' Mem. P. & A. at 12.]

Plaintiffs respond that Defendants' reliance on the reasonableness standard set forth in *O'Connor* directly contradicts Ninth Circuit authority. [Pls.' Reply at 5–6.] They argue that this search was not an investigation of work-related employee misconduct, but part of a criminal investigation stemming from a criminal complaint filed by Larson, and that detectives from the detective bureau investigate crimes,

---

**9.** Several cases discuss the severity of video surveillance. *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir.1992) (Kozinski, J., concurring) ("[E]very court considering the issue has noted, video surveillance can result in extraordinarily serious intrusions into personal privacy."); *United States v. Falls*, 34 F.3d 674, 680 (8th Cir.1994) ("It is clear that

silent video surveillance ... results in a very serious, some say Orwellian, invasion of privacy."); *United States v. Cuevas–Sanchez*, 821 F.2d 248, 251 (5th Cir.1987) (holding that a camera monitoring all of a person's activity "provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state.").

but do not conduct internal investigations. [Pls.' Opp'n at 5, Pls.' Reply at 5–6.]

■ To determine the reasonableness of a search requires " 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *O'Connor*, 480 U.S. at 719, 107 S.Ct. 1492 (citing *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). It is well-settled that searches without consent or authorized by a warrant are unreasonable, except in certain circumstances. *Id.* (quoting *Mancusi v. DeForte*, 392 U.S. 364, 370, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968)). A search by a public employer for noninvestigatory, work-related purposes and for investigations of work-related misconduct, however, are judged by a reasonable cause, not a probable cause, standard. *Id.* at 725–26, 107 S.Ct. 1492 (finding that a public employer's interest in searching employees is substantially different than the interest of law enforcement because an employer is trying to ensure that its agency operates effectively and efficiently).

A public employer's search for evidence of criminal conduct, on the other hand, does not benefit from the reasonableness standard set forth in *O'Connor*. *Taketa*, 923 F.2d at 675 (holding that a law enforcement agency can not "cloak itself in its public employer robes" when searching for evidence to be used in a criminal prosecution).

In *Taketa*, DEA agents physically searched the office of Thomas O'Brien, a state agent working in the DEA's airport office because there was suspicion he was misusing "pen registers." *Id.* at 668–69. While after searching his office and finding evidence of misconduct, the agents installed a hidden video camera to record O'Brien's activities. *Id.* at 669. The court held that it was not "unreasonable for the

DEA agents to enter O'Brien's office as a part of the internal investigation that was directed at uncovering evidence of a DEA employee's misuse of a pen register;" however, "the video surveillance was not an investigation of work-related employee misconduct . . . . It was, rather, a search for evidence of criminal conduct." *Id.* at 674–75. The *Taketa* and *O'Connor* holdings can be interpreted as stating that when a law enforcement agency, as a public employer, has reasonable cause to suspect a specific employee of misconduct, it can conduct a minimal search to confirm those suspicions; on the other hand, when a law enforcement agency orchestrates a search to gain direct evidence of a specific employee's confirmed misconduct, it is not acting as an employer.

■ Plaintiffs have presented sufficient evidence that the purpose of the search here was to gain evidence of criminal conduct for a later prosecution. The covert video surveillance was initiated because of Larson's criminal complaint concerning the theft of his flashlight. [Schneider Depo. at 101:8–101:18.] The criminal complaint was given a case number, listed the Penal Code section that was violated, had the "prosecution desired" box checked, and was assigned to Defendant Schneider, from the detective bureau. [*Id.* at Ex. 112.] In other words, the procedures followed here were the same that would have been followed had a person filed a criminal complaint concerning a petty theft in a private employer's office.

Defendant Schneider's search was not an attempt to confirm suspicions of specific misconduct of an OPD officer because there was no specific suspect. Defendant Schneider used the video surveillance as part of a "sting" operation to lure the unknown thief into committing another petty theft.

Defendants present no evidence that the motivation for this search was to ensure that OPD operated effectively and efficiently. They merely make a conclusory assertion that this search was a governmental search designed to investigate violations of workplace rules and that Defendant Schneider's sole focus was institutional security and maintenance. [Defs.' Mem. P. & A. at 10, Defs.' Opp'n at 9–10.] That Larson was a fellow police officer and the theft took place on OPD property does not automatically establish that this search was an employer search to investigate misconduct. Not only does this assertion disregard the holding in *Taketa*, but to adopt Defendants reasoning would be to create a per se rule that when a law enforcement agency is investigating crimes by its employees or on its property, the probable cause standard does not apply.

Thus, no reasonable jury could conclude that this search was an employer search designed to discover employee misconduct; the Court concludes the search would be governed by the probable cause standard.

### 4. Conclusion

■ Plaintiffs have satisfied their burden of demonstrating that there are no genuine issues of material fact whether their Fourth Amendment rights were violated. No reasonable jury could find that Plaintiffs did not have a reasonable expectation of being free from covert video surveillance while in OPD's locker room, or that the search was reasonable under the probable cause standard without a warrant. Plaintiffs' Motion for Summary Judgment is granted to the extent that it requests a finding of liability against Defendant Schneider on the Fourth Amendment claim. Defendants' Motion for Summary Judgment is denied to the extent

that it requests a judgment that Defendant Schneider, Del Rio, and Scharf[10] did not violate Plaintiffs' Fourth Amendment rights.

### B. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Plaintiffs need not cite a case specifically on point establishing the official action as unlawful, but they must establish that in light of pre-existing law the unlawfulness of Defendants' actions is apparent. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

■ These issues, the existence of clearly established law and whether the defendant acted reasonably in light of the clearly established law, are questions of law. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994); *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). In *Harlow*, the Court stated:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to

---

**10.** As to Defendants Del Rio and Scharf, there are genuine issues of material fact concerning

their involvement and knowledge of this search. *See* Section IV.

"know" that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727. If an officer's actions are objectively reasonable under the circumstances and in light of the clearly established law, then qualified immunity should be found. *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034. "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### 1. Constitutional Violation

█ Defendants contend that Defendant Schneider is protected by qualified immunity because Plaintiffs have not established a Fourth Amendment violation. [Defs.' Opp'n at 11–14.]

This argument fails because as discussed above in Section V.A, there are no genuine issues of material fact concerning whether Defendant Schneider violated Plaintiffs' Fourth Amendment rights.

### 2. Clearly Established Law

Plaintiffs argue that the law concerning covert video surveillance was clearly established in 1996. [Pls.' Mem. P. & A. at 10.] They assert that although no authority is on point, numerous cases have held that video surveillance is particularly intrusive on people's privacy interests and that a reasonable officer would have recognized that covert video surveillance of a locker room without a warrant violates the Fourth Amendment. [*Id.* at 10–12.]

Defendants counter that the law concerning covert video surveillance of a locker room was not clearly established in 1996. [Defs.' Opp'n at 14.] They argue that California law did not require a warrant for video surveillance of a locker room until January 1, 1999, and that there is no federal authority on point. [*Id.* at 14–15.] Defendants also assert that there is no bright line test to determine if a search is reasonable under *O'Connor*. [Defs.' Mem. P. & A. at 10.]

Plaintiffs respond that whether or not the *O'Connor* reasonableness standard applies, it was "apparent" that Defendant Schneider's actions violated the Fourth Amendment under existing authority. [Pls.' Reply at 6–7.]

In 1996, the general principles and tests concerning the Fourth Amendment were clearly established, *see, e.g., Katz*, 389 U.S. at 351–52, 88 S.Ct. 507, and there were numerous cases holding that video surveillance is a significant intrusion on people's privacy. *See Taketa*, 923 F.2d at 677, *Koyomejian*, 970 F.2d at 551; *Falls*, 34 F.3d at 680; *Cuevas–Sanchez*, 821 F.2d at 251. Most importantly, in 1991, the Ninth Circuit held that covert video surveillance of a person in a shared office violated the Fourth Amendment. *Taketa*, 923 F.2d at 678. While there were no decided cases concerning warrantless, covert video surveillance in a locker room, as discussed above, the level of privacy is inherently greater in a locker room compared to an office. Thus, it would have been apparent to a reasonable officer in 1996 that a covert video search of a locker room likely would violate the Fourth Amendment.

In light of the Court's ruling in Section V.A.3, it is immaterial that the *O'Connor* test requires a case-by-case analysis. Also, that the precise contours of video

surveillance and the Fourth Amendment are still not defined today, *Gonzalez*, 328 F.3d at 548, does not suffice to rebut that in 1996, it would have been apparent to a reasonable officer that the search here likely violated the Fourth Amendment.

## C. *Monell* **Claim**

 Defendants assert that Defendants City and OPD cannot be liable under the doctrine of respondeat superior for any § 1983 violation of its employees, unless the constitutional violation was pursuant to a policy, custom, or practice of Defendant City. [Defs.' Mem. P. & A. at 13, Defs.' Reply at 6–7.] Defendants contend that Plaintiffs have failed to allege a "particular" policy, custom, or practice which caused the constitutional violation. [Defs.' Mem. P. & A. at 13.]

Plaintiffs respond that the case law and Defendant Scharf's deposition testimony establish that he was the official policy maker for Defendant OPD, which suffices to establish liability for Defendant City under § 1983. [Pls.' Opp'n at 6.] Plaintiffs contend that Defendant Scharf knew about and authorized the covert surveillance. [*Id.* at 7–8.]

Defendants argue that the excerpts of the deposition testimony cited by Plaintiffs are taken out of context and insufficient to establish a *Monell* claim. [Defs.' Reply at 8–9.]

A municipality may not be held liable for the Constitutional torts of its officers under a respondeat superior theory. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff in a § 1983 case can establish municipal liability in one of three ways. *See Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992). "First, the plaintiff may prove that a city employee committed that alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which con-

stitutes the standard operating procedure of the local governmental entity." *Id.* (internal quotations omitted) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018). A plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policymaking employee. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir.2000) ("Only if a plaintiff·shows that his injury resulted from a 'permanent and well settled' practice may liability attach for injury resulting from a local government custom.") (quoting *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989)).

"Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself constituted an act of official governmental policy." *Gillette*, 979 F.2d at 1346 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *McKinley v. City of Eloy*, 705 F.2d 1110, 1116 (9th Cir. 1983)). "Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette*, 979 F.2d at 1346–47 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Hammond v. County of Madera*, 859 F.2d 797, 801–02 (9th Cir.1988)).

Defendants correctly argue that there is no evidence in the record that Plaintiffs' injuries resulted from a policy, practice, or custom of Defendant City; however, Plaintiffs' *Monell* claim is not premised on such a theory. Plaintiffs' *Monell* theory is that Defendant Scharf, as a policy maker for Defendant City, authorized or otherwise

ratified the unconstitutional search. [Pls.' Opp'n at 6.] Defendants have not satisfied their initial burden of showing that there are no genuine issues of material fact concerning Plaintiffs' *Monell* claim.

Accordingly, the Court denies Defendants' Motion to the extent that it requests judgment on Plaintiffs' *Monell* claim against Defendant City.[11]

### D. Supervisor Liability Under § 1983

 Additionally, Defendants contend that Defendants Scharf and Del Rio are liable, as supervising officers, under § 1983 only if they played an affirmative part in the alleged action, or knew of the constitutional violation and failed to prevent it. [Defs.' Mem. P. & A. at 14, Defs.' Reply at 7.] Defendants argue that Defendants Scharf and Del Rio played no role and had no knowledge of the covert video surveillance. [Defs.' Mem. P. & A. at 15.]

Plaintiffs respond that Defendants Scharf and Del Rio are liable because there is evidence that they participated in or had direct knowledge of the violation and failed to stop it. [Pls.' Opp'n at 9.] Concerning Defendant Scharf's involvement, Plaintiffs argue that (1) Defendant Schneider was told by John Johnson, the Sergeant in charge of Internal Affairs and who reported directly to Defendant Scharf, that the covert surveillance was authorized, (2) Joe Sifuentes, who did wiring for the OPD computers, was told by Defendant Scharf that "Oh, it's you that's taking it down," when Sifuentes was spooling wires that were connected to the camera before its presence was known, (3) Defendant Scharf himself testified in his deposition that he would normally be consulted before such surveillance was initiated, and (4) although Defendant Scharf testified that it would be his understanding that a warrant would be required, after the lawsuit was filed, he told Defendant Schneider

that there was nothing to worry about and Defendant Schneider did nothing wrong. [Id. at 7–8.]

As to Defendant Del Rio, Plaintiffs contend that he had knowledge of the covert videotaping because (1) Defendant Schneider's police report had a handwritten note that the equipment was from Defendant Del Rio, (2) the only unit that had a camera like the one used was the narcotics unit, which Defendant Del Rio oversaw, and (3) the stated policy in the unit was that Defendant Del Rio would have to authorize a loan of equipment to another unit. [*Id.*]

Defendants respond that Plaintiffs merely rely on "attenuated supposition upon supposition" in arguing that Defendants Scharf and Del Rio had knowledge of or participated in the covert video surveillance. [Defs.' Reply at 8.]

Under § 1983, supervisors can only be held liable if "they play an affirmative part in the alleged deprivation of constitutional rights." *Graves v. City of Coeur D'Alene,* 339 F.3d 828, 848 (9th Cir.2003) (quoting *Rise v. Oregon,* 59 F.3d 1556, 1563 (9th Cir.1995)). This means the supervisor has to "set in motion a series of acts by others . . ., which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id.* (quoting *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991)).

Defendants have satisfied their initial burden of presenting evidence that Defendants Scharf and Del Rio played no affirmative role in this search. Plaintiffs, however, have presented evidence that it was the normal operational protocol for Defendant Scharf to have knowledge of such a search. Also, there is evidence that it was normal operational protocol that Defendant Del Rio had to approve the use of the camera used here. Further, evidence has

---

11. Plaintiffs did not move for summary judg- ment on this issue.

been presented upon which an inference can be made that Defendant Scharf had knowledge of the covert video surveillance before its existence was publicly known. As the non-moving party on this issue, all inferences are to be drawn in Plaintiffs' favor. Thus, Plaintiffs have satisfied their resulting burden by presenting evidence that successfully controverts Defendants' evidence, creating genuine issues of material fact concerning Defendants Scharf's and Del Rio's knowledge and involvement.

Therefore, the Court denies Defendants' Motion to the extent that it requests judgment in favor of Defendants Scharf and Del Rio on Plaintiffs' § 1983 claim.

### E. Defendant Thompson Acted Under Color of State Law for Purposes of the Fourth Amendment and § 1983

Plaintiffs contend that Defendant Thompson, even though he is a private actor, nonetheless acted under the "color of law" for § 1983 purposes. [Pls.' Mem. P. & A. at 12.] Plaintiffs argue that Defendant Thompson conspired with Defendant Schneider to deprive Plaintiffs of their Fourth Amendment rights because he knew that officers used the locker room to change clothes when he installed the camera. [*Id.*] Plaintiffs assert that Defendants Thompson and Schneider had the purpose of secretly monitoring OPD's officers in a private location. [*Id.* at 14.]

Defendants respond that there was no conspiracy between Defendants Thompson and Schneider to violate Plaintiffs' rights because they never had the required "meeting of the minds." [Defs.' Opp'n at 17.] Defendants aver that while Defendant Thompson installed the camera knowing that people would be changing clothes in the locker room, he was under the impression that the installation was approved by Defendant Schneider's supervisors. [*Id.* at 17–18.] Defendants also contend that if Defendant Thompson did act under the color of state law, then he is entitled to qualified immunity.[12] [Defs.' Mem. P. & A. at 16.]

Plaintiffs counter that they have presented sufficient evidence that Defendant Thompson had knowledge of, and participated in, the unlawful act, and his ignorance of the law provides no defense for his actions. [Pls.' Reply at 9.]

Whether a private party engaged in state action is a highly factual question. *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1209 (9th Cir.2002) (citing *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983)). There are four tests to determine if private action actually constitutes state action: Joint action, symbiotic relationship, public functions, governmental coercion;[1314] only one test need be satisfied. *Id.* at 1210; *Kirtley v. Rainey*,

---

**12.** Defendants are incorrect for two reasons: (1) private parties do not enjoy qualified immunity *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), *Wyatt v. Cole*, 504 U.S. 158, 164–169, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), and (2) the law concerning covert video surveillance in a locker room was clearly established. *See* Section V.B, *supra*.

**13.** Plaintiffs argue that Defendant Thompson's actions satisfy only the joint action test.

**14.** Another panel of the Ninth Circuit held that there are the following four tests: (1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus. *Kirtley*, 326 F.3d at 1092. While the *Kirtley* Court defines the public function test the same way as the *Brunette* Court, what it names the "joint action test" is defined similarly to the *Brunette* Court's "symbiotic relationship test." *Compare Kirtley*, 326 F.3d at 1093–94 *with Brunette*, 294 F.3d at 1213–14. Also, the *Kirtley* Court's "nexus" test is similar to the *Brunette* Court's "joint action test." *Compare Kirtley*, 326 F.3d at 1094–95 *with Brunette*, 294 F.3d at 1211–13. This Court will use the "joint action" test as defined in *Brunette*.

**1114**

326 F.3d 1088, 1092 (9th Cir.2003); *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 303, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) ("[T]he implication of state action is not affected by pointing out that the facts might not loom large under a different test.").

### 1. Joint Action

██ A joint action exists when the private party is a "willful participant" with the State or its agents in activity that deprives a person of their constitutional rights, *Brunette*, 294 F.3d at 1210 (citing *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)), and the private party's actions are "inextricably intertwined" with the State's actions. *Id.* (citing *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir.1996)). A showing that a private party and state actors conspired to violate a person's constitutional rights will satisfy the joint action test as well. *Id.*

██ To show a conspiracy between private and state actors for § 1983 purposes, there must be an agreement or meeting of the minds to violate a person's constitutional rights. *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir.1983)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). A private party's mere acquiescence to the unconstitutional demands of a state actor is insufficient; however, it is also not necessary to show that a private party knew the exact parameters of the plan. *Id.* "A private party need only share the general conspiratorial objective." *Id.* "[T]he accused must have had a specific intent to do an unlawful act or to do a lawful act by unlawful means." *People v. Bowman*, 156 Cal.App.2d 784, 797, 320 P.2d 70 (1958).

In *Fonda*, the Federal Bureau of Investigation ("FBI") requested that a bank turn over Fonda's bank records. *Fonda*,

707 F.2d at 436–37. After first requesting that the FBI seek a warrant, the Bank turned over the records after they were told it was a matter of national security. *Id.* The Court held that no conspiracy existed because the bank employees were unaware of the government's objectives in destroying Fonda's credibility when they turned over the records and the bank employees had no affirmative duty to learn the government's objectives. *Id.* at 438.

Here, the facts concerning Defendant Thompson's involvement are not disputed; however, the parties disagree about their legal effect. As discussed above in Section III, it is uncontroverted that Defendant Thompson installed the surveillance equipment in the locker room at the request of Defendant Schneider, he subjectively knew that people used the locker room to change their clothes, and he was told by Defendant Schneider that Defendant Schneider had obtained approval for the installation of the camera from his supervisors. [Thompson Depo. at 10:16–10:22, 13:15–13:17, 14:4–14:6.]

As discussed above in Section V.A, the unlawful act here was the covert video surveillance of Plaintiffs in the locker room, not the mere act of installing recording equipment in the locker room. Defendants' evidence, making all inferences in the light most favorable to Defendants, the non-moving party on this issue, establishes that Defendants Schneider and Thompson simply conspired to install a camera in the locker room. Thompson's subjective knowledge that the officers would be changing their clothes in the locker room does not suffice to establish that he was aware of Defendant Schneider's general objective to record Plaintiffs covertly while in the locker room. While Defendant Thompson need not know every detail of the conspiracy, here, there is no evidence that he acted with the intent of furthering the general conspiratorial goal.

The facts here resemble those in *Fonda*, i.e., the evidence establishes that Defendant Thompson acquiesced to Defendant Schneider's request to install the camera. There is no evidence that Defendant Thompson was aware of Defendant Schneider's improper objectives and Defendant Thompson was under no duty to discover these improper objectives.[15]

Thus, the Court denies Plaintiffs' Motion to the extent that it requests judgment against Defendant Thompson on Plaintiffs' § 1983 claim. While the Court finds that there is insufficient evidence before it that Defendants Schneider and Thompson conspired, Defendants' Motion does not move for judgment for Defendant Thompson on this ground. [Defs.' Mem. P. & A. at 16.]

## F. Defendant Thompson's Good Faith Defense

Defendants contend Defendant Thompson is protected from liability by a "good faith defense" because (1) he simply assisted his friend install a video camera, which he thought was approved by Defendant Schneider's supervisors, (2) there is no evidence he knew his actions were illegal, and (3) he thought his actions were legal because he performed them at the direction of a police officer and there was no state law banning such actions at the time. [Defs.' Mem. P. & A. at 16–17, Defs.' Opp'n at 18–19.]

Plaintiffs respond that the Supreme Court and the Ninth Circuit have never recognized a good faith defense for a private party who conspires with a state actor to violate someone's civil rights. [Pls.' Opp'n at 10, Pls.' Reply at 9.] Plaintiffs contend that the establishment of a good faith defense would be improper because the policy rationale for why qualified immunity does not apply to private parties belies any argument for a good faith defense. [Pls.' Opp'n at 10.] Specifically, Plaintiffs contend that since private parties do not have the same accountability to the public as actual government employees, the establishment of a good faith defense would serve to encourage, not discourage, private parties from engaging in joint action with the government that may deprive people of their constitutional rights. [*Id.* at 10.]

Defendants counter that (1) the Supreme Court and the Ninth Circuit have held that there "may" be a good faith defense for private parties sued pursuant to § 1983, (2) the defense is recognized by other circuits, and (3) Plaintiffs have presented no evidence that Defendant Thompson did not act in good faith when installing the camera at Defendant Schneider's request. [Defs.' Reply at 9–11.]

The Supreme Court and the Ninth Circuit never have explicitly recognized a good faith defense for private parties sued pursuant to § 1983. In holding that private actors did not enjoy qualified immunity, the Supreme Court stated the following:

[W]e do not foreclose the possibility that private defendants faced with § 1983 liability ... could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens. Because those issues are not fairly before us, however, we leave them for another day.

*Wyatt*, 504 U.S. at 169, 112 S.Ct. 1827. Citing *Wyatt*, the Ninth Circuit declined to apply qualified immunity to private actors, holding it did not foreclose the possibility of a private party asserting a good faith

---

**15.** The Court notes that while conspiracy is only one theory of establishing joint action, Plaintiffs have not argued that Defendant Thompson was a willful participant with the state actors whose actions were "inextricably interwined" with the State.

defense. *Jensen v. Lane County*, 222 F.3d 570, 580 n. 5 (9th Cir.2000).

Defendants advance no grounds why this Court should adopt a good faith defense for a private party; mere assertion that both the Supreme Court and the Ninth Circuit have not foreclosed the possibility of such a defense, and that other circuits apply it, is woefully insufficient. Moreover, they suggest no standards by which this Court should apply such a defense, except for citing a Third Circuit case for the proposition that the private actor's subjective state of mind is relevant. [Defs.' Mem. P. & A. at 16 (citing *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277 (3d Cir.1994).) ] Such conclusory arguments do not persuade the Court that a good faith defense should be applied here.

Nevertheless, despite Defendants' unpersuasive arguments on this issue, the Court will further examine it.

In *Harlow*, the Supreme Court changed the long-standing standard that an officer who pled a "qualified" or "good faith" defense had to satisfy both subjective and objective elements. *Harlow*, 457 U.S. at 815–19, 102 S.Ct. 2727. The Court held that the need for an officer to prove his subjective belief resulted in protracted litigation on insubstantial claims. *Id.* at 815–19, 102 S.Ct. 2727. The *Harlow* Court formulated the modern, purely objective, "qualified immunity" [16] as discussed above in Section V.B to provide greater protections for officers.

The Supreme Court in *Wyatt* held that qualified immunity's broad protections are not transferable to private parties because the general rationales of qualified immuni-

ty are not applicable. 504 U.S. at 167–68, 112 S.Ct. 1827. The Court stated as follows,

> Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service. In short, the qualified immunity recognized in *Harlow* acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.

*Id.* (quotation marks and citations omitted). It was after this analysis that the Court concluded that a private party may assert a good faith defense. *Id.* at 169, 112 S.Ct. 1827.

*Harlow*'s creation of a new form of broad qualified immunity, and *Wyatt*'s failure to extend such a protection to private parties, have not overruled the good faith defense that existed before these decisions. In other words, the law concerning a private party's defense to § 1983 remains unchanged from the law as it existed pre-*Harlow*. This interpretation does not answer the question whether a private party was permitted to bring a pre-*Harlow* good faith defense in this situation.

The Court need not answer it, however, because the good faith defense asserted by Defendant Thompson would include both subjective and objective components. [17] As

---

**16.** The *Harlow* Court's qualified immunity theory was not a defense to liability as the old concept was, but was an immunity from suit, like absolute immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

**17.** If a good faith defense consisted of a purely objective standard it would be the equivalent of the *Harlow* qualified immunity defense. If the good faith defense was merely a subjective standard, this would essentially

discussed above in Section V.B, the law concerning covert video surveillance was clearly established in 1996. Thus, even if Defendant Thompson could assert a pre-*Harlow* good faith defense, he does not satisfy the objective aspect of the test.

Accordingly, the Court denies Defendants' Motion to the extent it requests judgment for Defendant Thompson.

### G. Statute of Limitations on Plaintiffs State Law Claims

 Defendants contend that Plaintiffs' claims are barred for failure to comply with the California Tort Claims Act, which requires that a written claim for damages be brought within six months of the injury. [Defs.' Mem. P. & A. at 18, Defs.' Opp'n at 19–20.] Defendants argue that the injury occurred when Harris discovered the video tape in April or May 2003, and that Plaintiffs' claims were submitted on July 15, 2004, and August 20, 2004, more than one year after the tape was discovered. Accordingly, Defendants assert the claims are untimely. [Defs.' Mem. P. & A. at 19.]

Plaintiffs respond that their claims are not barred under the California Tort Claims Act because (1) Harris did not tell Plaintiffs Trujillo or Quon about the tape until August or September 2003, and they filed a tort claim and a petition to file a late tort claim on August 20, 2004, and (2) the rest of the class was not aware of the tape until February 2004. [Pls.' Opp'n at 14.] Plaintiffs contend that Defendants' argument that the statute of limitations began to accrue on the date Harris discovered the tape is unsupported by authority because the limitations period does not begin to accrue until Plaintiffs knew or should have known about the injury: August or September 2003 for Plaintiffs Trujillo and Quon, and February 2004 for the rest of the class. [Pls.' Opp'n at 14–15.]

Plaintiffs also argue that Defendants waived the statute of limitations defense by denying their claims on the merits. [*Id.* at 16.]

Defendants counter that Harris knew or should have known of the injury when he discovered the tape and watched it and that it is immaterial that the rest of the named Plaintiffs or class Plaintiffs were aware of the injury. [Defs.' Reply at 13.]

California law requires that a tort claim be filed within six months of the cause of action's accrual. Cal. Gov.Code § 911.2(a). A cause of action accrues when the plaintiff discovers his or her injury and the negligent cause thereof. *Rivas v. Safety–Kleen Corp.*, 98 Cal.App.4th 218, 224, 119 Cal.Rptr.2d 503 (2002). "[T]he limitations period begins once the plaintiff ... has notice or information of circumstances to put a reasonable person on inquiry .... A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110–11, 245 Cal.Rptr. 658, 751 P.2d 923 (1988). In other words, "the plaintiff is charged with this awareness as of the date he or she suspects or should suspect that the injury was caused by someone's wrongful act." *Brandon G. v. Gray*, 111 Cal.App.4th 29, 35, 3 Cal.Rptr.3d 330 (2003).

Plaintiffs correctly argue that it would be illogical for the statute of limitations for Plaintiffs' claims to begin to accrue when Harris discovered the video in April or May 2003. They had no reason to believe their Fourth Amendment rights were violated because Harris did not inform them about the tape. Accordingly, the limita-

---

create an "ignorance of the law" defense, which is widely disapproved.

tion period for Plaintiffs Trujillo and Quon began to accrue in August or September 2003, when Harris informed them about the videotaping. The statute of limitations for the remaining Plaintiffs' claims began to accrue in February 2004, when the surveillance became publicly known.

Plaintiffs Anderson's, Bernard's, and Pefferle's [18] tort claim filed on July 15, 2004, was filed within the limitations period, as it was filed within six months of February 2004. Plaintiffs Trujillo's and Quon's claim, while filed on August 23, 2004, was filed with a proper application for an extension of time. [Eliasberg Decl. at Ex. 1 *in* Pls.' Decls. in Opp'n.] Plaintiffs Trujillo's and Quon's claim was denied on the merits, which establishes that their application for an extension of time was

accepted.[19] [*Id.* at Ex. 2.] Thus, Plaintiffs Trujillo's and Quon's claim was filed before the limitations period expired.

While it is unclear whether Plaintiff Ansman's and the class's tort claim filed on August 23, 2004, was filed timely,[20] Defendants have waived any statute of limitations defense. If Plaintiff Ansman's and the class's tort claim was filed untimely, Defendant City was required to notify them that their claim was untimely. Cal. Gov.Code § 911.3(a).[21] Failure to provide this notice to Plaintiff Ansman and the class waived Defendants' statute of limitations defense. Cal. Gov.Code § 911.3(b).[22]

Defendants' Motion is denied to the extent it asserts Plaintiffs did not comply with the notice requirement of the California Tort Claims Act.

---

18. The tort claim was also filed by Steven Hurst, Jim Renstrom, Ron Dupuis, Keith Henderson, and Nicko Carcich. [Ex. B *in* Disenhouse Decl.] That the tort claim listed Does 1–250 does not establish that it was filed on behalf of the class.

19. California Government Code § 911.8 states as follows:
 (a) Written notice of the board's action upon the application shall be given in the manner prescribed by Section 915.4.
 (b) If the application is denied, the notice shall include a warning in *substantially* the following form: . . .
 "If you wish to file a court action on this matter, you must first petition the appropriate court for an order relieving you from the provisions of Government Code Section 945.4 (claims presentation requirement). See Government Code Section 946.6. Such petition must be filed with the court within six (6) months from the date your application for leave to present a late claim was denied. . . ."

20. There is no evidence in the record about the specific date the surveillance became public knowledge, other than the month of February 2004. If Plaintiffs should have known of the surveillance on February 1, 2004, then the tort claim filed with the City on August 23,

2004, is untimely. On the other hand, if the limitations period began to accrue on February 26, 2004, then the tort claim would have been timely.

21. California Government Code § 911.3(a) states as follows:
 When a claim that is required by Section 911.2 to be presented not later than six months after accrual of the cause of action is presented after such time without the application provided in Section 911.4, the board or other person designated by it may, at any time within 45 days after the claim is presented, give written notice to the person presenting the claim that the claim was not filed timely and that it is being returned without further action.

22. California Government Code § 911.3(b) states as follows:
 Any defense as to the time limit for presenting a claim described in subdivision (a) is waived by failure to give the notice set forth in subdivision (a) within 45 days after the claim is presented, except that no notice need be given and no waiver shall result when the claim as presented fails to state either an address to which the person presenting the claim desires notices to be sent or an address of the claimant.

## H. Right to Privacy Guaranteed by Article I, Section 1 of the California Constitution

Plaintiffs argue that Defendants Schneider and Thompson violated the right to privacy guaranteed by Article I, Section 1 of the California Constitution because their actions constituted a serious invasion of a legally protected privacy interest. [Pls.' Mem. P. & A. at 15–16.] Plaintiffs contend that they had a legally protected privacy right because (1) general social norms recognize a right to be free from covert video surveillance, and (2) California law protects people from video surveillance in locker rooms. [*Id.* at 16–17.] Plaintiffs also argue that this intrusion was a serious invasion of their privacy rights because, by installing a camera hidden behind ceiling tiles and running cable to a VCR in an office 50 feet away, the invasion was careful and deliberate; and the invasion was "sustained and wide-ranging": The existing tape spanned three full days and captured officers wearing only underwear or a towel. [*Id.* at 17–18.]

Defendants respond that while the California Constitution may provide a broader standard for what is a reasonable expectation of privacy, Plaintiffs have failed to establish that their expectation was reasonable and legally protected under California law. [Defs.' Opp'n at 20, Defs.' Reply at 14.] Defendants argue that (1) the California statute prohibiting covert video surveillance without a warrant was not enacted until 1999, (2) Plaintiffs' reliance on California authority establishing that people have a reasonable expectation of privacy when urinating for a drug test is distinguishable from this situation, and (3) California Penal Code § 647(k) has no bearing on the issues raised in these Motions because it was not effective until after the camera was installed, and the purpose behind that law is to discourage people from videotaping people in various stages of undress without a legitimate purpose. [Defs.' Mem. P. & A. at 20, Defs.' Opp'n at 20–21, Defs.' Reply at 14, 21.]

Plaintiffs counter that while Labor Code § 435 might not have been enacted until 1999, Defendants do not adequately address Penal Code § 647(k), which makes it a misdemeanor to view a person in a changing room with a camera with the intent on invading their privacy. [Pls.' Opp'n at 17.] Plaintiffs also contend that Defendants need not commit a crime for them to infringe on a legally protected right because privacy law protects Plaintiffs' rights to be free from surreptitious video recording. [*Id.* at 17–18.]

Article 1, Section 1 of the California Constitution states that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

To establish a claim under the California Constitution, a plaintiff must establish the following: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." *Hill v. National Collegiate Athletic Assn.,* 7 Cal.4th 1, 39–40, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994). The first element is a question of law, and the last two elements are mixed questions of law and fact. *Id.* at 40, 26 Cal.Rptr.2d 834, 865 P.2d 633 (citations omitted). Defendants can prevail on a California Constitution privacy claim by negating any one of the three elements or establishing that the "invasion of privacy is justified because it substantively furthers one or more countervailing interests." *Id.* In the case that Defendants attempt to assert the affirmative defense of countervailing interests, Plaintiffs may "rebut a

defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." *Id.*

### 1. Legally Protected Privacy Interest

■ "Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ("informational privacy"); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ("autonomy privacy")." *Id.* at 35, 26 Cal.Rptr.2d 834, 865 P.2d 633. Legally protected privacy rights stem from common law, federal and state constitutional development, and statutory enactments. *Id.* at 36, 26 Cal.Rptr.2d 834, 865 P.2d 633.

As discussed above in Section V.A, the Court finds that Plaintiffs retained a Fourth Amendment right to be free from covert video surveillance while in Defendant OPD's men's locker room. This guaranteed right under the United States Constitution establishes a legally protected right of privacy. Defendants' argument that there was no specific statute prohibiting such surveillance at the time is irrelevant. The holding in *Hill* makes clear that a legally protected privacy right can be derived from other sources than statutory enactments. *Id.*

### 2. A Reasonable Expectation of Privacy

A reasonable expectation of privacy is context dependent; customs, practices, and the physical setting of the search may affect the reasonableness of a person's privacy expectations. *Id.* at 36, 26 Cal. Rptr.2d 834, 865 P.2d 633.

As discussed in Section V.A.2, Plaintiffs had a reasonable expectation of privacy from covert video surveillance in the locker room.

### 3. Conduct Constituting A Serious Invasion of Privacy

"Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Id.* at 37, 26 Cal.Rptr.2d 834, 865 P.2d 633.

Again, as discussed above in Section V.A.2, the intrusion on Plaintiffs' privacy was severe.

### 4. Countervailing Interests

Defendants contend that no liability exists for a breach of the state constitutional right to privacy because the search was a narrowly defined and limited employer investigation of a theft and was used to maintain a secure and operational police force. [Defs.' Mem. P. & A. at 20–21, Defs.' Opp'n at 21, Defs.' Reply at 15–16.]

Plaintiffs counter that the seriousness of the intrusion here requires that Defendants have a more significant countervailing interest to justify the intrusion than an investigation of a single theft of a flashlight. [Pls.' Mem. P. & A. at 18, Pls.' Opp'n at 18.] Plaintiffs assert that while Defendants cast their search as serving their interest in a "secure and operational police force," the only evidence before the Court is that the search was designed to investigate and resolve a misdemeanor offense. [Pls.' Reply at 11.] As to Defendants' assertions that this investigation was motivated by institutional security, Plaintiffs retort that after the bait bag was placed in the locker room and not stolen, Defendant Schneider (1) did not know if the investigation continued, (2) did not log the tape into evidence, and (3) did not review the tape. [Pls.' Opp'n at 19.]

"Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest.... Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests." *Hill,* 7 Cal.4th at 38, 26 Cal.Rptr.2d 834, 865 P.2d 633.

First, Defendants' assertion that the covert video surveillance was used to maintain a secure and operation police force is unsupported and belied by Defendants' own evidence and arguments. For example, if the covert video surveillance was needed to maintain an operational police force, why only conduct the surveillance for one weekend and why focus the camera on one specific area of the locker room? The relationship between covertly recording a small portion of a locker room and maintaining operational efficiency is tenuous at best.

Even assuming for the sake of argument that the surveillance was motived by Defendants' legitimate interest of maintaining a secure and operational police force, the invasion of Plaintiffs' privacy from the covert video surveillance far outweighs this interest.

Also, Plaintiffs have rebutted Defendants' countervailing interest defense because they have presented evidence from two experienced detectives that other feasible and effective alternatives to covert video surveillance exist. [Anderson Decl. at ¶¶ 7–10, Trujillo Decl. at ¶¶ 9–12 *in* Pls.' Dec. & Ex.] Defendants have failed to present evidence to rebut Plaintiffs' evidence and their arguments for why Plaintiffs' evidence should be disregarded are unconvincing. [Defs.' Opp'n at 22–23, Defs.' Reply at 16–17.]

Thus, balancing the purported governmental interest against the severity of the intrusion and the availability of other less intrusive means, no reasonable jury could find that Defendants' intrusion was justified.

Accordingly, there are no genuine issues of material fact concerning whether Plaintiffs' California Constitutional right to privacy was violated by Defendants Schneider and Thompson. As discussed above, there are material issues of genuine fact as to Defendants Del Rio's and Scharf's involvement in the search. Further, under California Government Code § 815.2(a), which holds a City liable for the injuries caused by its employees acting in the scope of their employment, Defendant City is liable for Defendant Schneider's violation of the California Constitution.

As will be discussed below, Defendants Schneider, Thompson, and City may enjoy immunity from this violation, however.

### I. Common Law Tort: Invasion of Privacy

■ Plaintiffs argue that Defendants Thompson's and Schneider's installation of the camera in the locker room intruded on a place in which Plaintiffs had a reasonable expectation of privacy because (1) there is a California Penal Code that prohibits installing hidden cameras in changing and dressing rooms, and (2) covert video surveillance in locker room is highly intrusive. [Pls.' Mem. P. & A. at 21–24.]

Defendants' only counter is to argue that Plaintiffs did not have a reasonable expectation of privacy while in the locker room because it was freely accessible to officers, females, and civilians. [Defs.' Mem. P. & A. at 21.]

The cause of action for the tort of intrusion has the following two elements: "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Sanders v. American Broadcasting Companies, Inc.,*

20 Cal.4th 907, 914, 85 Cal.Rptr.2d 909, 978 P.2d 67 (1999).

### 1. Intrusion Into A Private Place, Conversation, or Matter

Merely being observed or recorded is insufficient to establish the tort of intrusion; rather, the intrusion must be a penetration into a "zone of physical or sensory privacy surrounding" in which a person has an objectively reasonable expectation of seclusion or solitude. *Id.* at 914–15, 85 Cal.Rptr.2d 909, 978 P.2d 67. An objective expectation of privacy, however, need not mean absolute or complete privacy. *Id.* at 915, 85 Cal.Rptr.2d 909, 978 P.2d 67. That a limited number of people might observe one's conduct in a certain place, does not diminish the reasonableness of the expectation of privacy in that place. *Shulman v. Group W Productions, Inc.*, 18 Cal.4th 200, 232–33, 74 Cal.Rptr.2d 843, 955 P.2d 469 (1998); *Sanders*, 20 Cal.4th at 916, 85 Cal.Rptr.2d 909, 978 P.2d 67 ("Although the intrusion tort is often defined in terms of 'seclusion' . . . the seclusion referred to need not be absolute. Like 'privacy,' the concept of 'seclusion' is relative. The mere fact that a person can be seen by someone does not automatically mean that he or she can legally be forced to be subject to being seen by everyone.")(quotation marks and citations omitted).

For the reasons discussed in Section V.A.2, the locker room was a place where Plaintiffs had an objectively reasonable expectation of privacy.

### 2. Offensiveness of Intrusion

To determine the offensiveness of an intrusion, a court should consider the "circumstances of the intrusion, including its degree and setting and the intruder's motives and objectives." *Shulman*, 18 Cal.4th at 236, 74 Cal.Rptr.2d 843, 955 P.2d 469 (quotation marks omitted).

As set forth repeatedly in this Order, the nature of the intrusion here is severe. Neither Defendants' evidence nor their arguments present a sufficient justification for the use of covert video surveillance in a locker room, especially for the type of crime investigated and the availability of less intrusive alternatives.

Thus, the Court grants Plaintiffs' request for summary judgment against Defendants Schneider, Thompson, and the City on their common law tort of invasion of privacy.

As will be discussed below, Defendant Schneider, Thompson, and City may enjoy immunity for this violation, however.

### J. Immunity under California Government Code

Defendants assert that Defendant Schneider is protected under California Government Code § 820.2 because his decision to conduct covert surveillance in the locker room was pursuant to discretion vested in him as a detective. [Defs.' Mem. P. & A. at 22, Defs.' Reply at 18.] Also, Defendants contend that Defendants Scharf and Del Rio are immune under section 820.2 because they were acting pursuant to discretion vested in their positions. [Defs.' Mem. P. & A. at 22–23, Defs.' Reply at 19.]

Defendants also contend that section 821.6 provides immunity for officers who violate another person's rights when they are investigating criminal activity. [Defs.' Mem. P. & A. at 23, Defs.' Reply at 19–20.] Defendants assert that the City and OPD are immune under section 815.2(b) because they are not liable for acts done by employees who are immune. [Defs.' Mem. P. & A. at 23.]

Plaintiffs respond that section 820.2 does not provide Defendant Schneider immunity because his decision to conduct covert sur-

veillance in the locker room was not a "basic policy decision." [Pls. Opp'n at 21.] Plaintiffs argue that Defendants Schneider's, Scharf's, and Del Rio's violations are not protected under section 821.6 because their investigation did not lead to an actual criminal proceedings. Plaintiffs contend that (1) to extend this immunity to illegal actions taken by a police officer that did not result in a criminal proceeding would immunize police officers from claims such as excessive force, race-based arrests, and other egregious crimes, and (2) section 821.6 should be limited to malicious prosecution claims and not other torts. [*Id.* at 22–25.]

### 1. Immunity Under California Government Code § 820.2

██ California Government Code § 820.2 states as follows:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

A discretionary act requires a conscious balancing of risks and advantages when making basic policy decisions, *see Bell v. State of California*, 63 Cal.App.4th 919, 929, 74 Cal.Rptr.2d 541 (1998); it does not protect operational or ministerial decisions that implement policies. *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir.1998) (citing *Johnson v. State of California*, 69 Cal.2d 782, 796, 73 Cal.Rptr. 240, 447 P.2d 352 (1968)). A ministerial act is an act pursuant to an order, or an act where a person had no choice. *McCorkle v. City of Los Angeles*, 70 Cal.2d 252, 261, 74 Cal.Rptr. 389, 449 P.2d 453 (1969). An operational act is one in which the person who made the decision, implemented the decision. *See id.*

Moreover, even when one person makes a discretionary decision, this immunity should be applied narrowly and limited to "areas of quasi-legislative policy-making ... [which] are sufficiently sensitive to call for judicial abstention from interference that might even in the first instance affect the coordinate body's decision-making process, and should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions." *Barner v. Leeds*, 24 Cal.4th 676, 685, 102 Cal.Rptr.2d 97, 13 P.3d 704 (2000) (quotations and citations omitted). Routine discretionary decisions as part of a person's normal job duties are not covered by this immunity. *Sanborn v. Chronicle Pub. Co.*, 18 Cal.3d 406, 415, 134 Cal. Rptr. 402, 556 P.2d 764 (1976) (holding that a decision by the clerk of a city to talk to the press was not a sufficient decision to warrant immunity).

Here, Defendants have not satisfied their initial burden of showing that Defendant Schneider's decision was discretionary, as defined by California authority. Defendants' argument that the decision to implement the covert video surveillance was in his discretion as the lead investigator might be correct; however, this does not automatically lead to immunity. Decisions on how to proceed with an investigation are routine ones, as part of Defendant Schneider's employment. Hence, Defendant Schneider does not enjoy immunity under section 820.2.

### 2. Immunity Pursuant to California Government Code § 821.6

California Government Code § 821.6 states as follows:

> A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment,

even if he acts maliciously and without probable cause.

 Immunity under section 821.6 has been interpreted as providing immunity for officers conducting investigations because an investigation is an essential step in initiating formal proceedings.[23] *Amylou R. v. County of Riverside*, 28 Cal.App.4th 1205, 1210–11, 34 Cal.Rptr.2d 319 (1994) ("Since the acts of which [plaintiff] complains are incidental to the investigation of the crimes, and since investigation is part of the prosecution of a judicial proceeding, those acts were committed in the course of the prosecution of that proceeding."); *Baughman v. State of California*, 38 Cal. App.4th 182, 192, 45 Cal.Rptr.2d 82 (1995) (citing *Amylou*, the Court held that section 821.6 "shields investigative officers from liability for injuries suffered by witnesses or victims during an investigation.... Officers are also immune from claims made by those who are not the actual targets of the investigation of the prosecution, but who happen to be injured by decisions an officer makes during the course of such investigation."); *Jenkins v. County of*

*Orange*, 212 Cal.App.3d 278, 284, 260 Cal. Rptr. 645 (1989) (holding that a social worker is protected from liability under section 821.6 for her conduct in a child abuse investigation); *Kemmerer v. County of Fresno*, 200 Cal.App.3d 1426, 1436–37, 246 Cal.Rptr. 609 (1988). Moreover, section 821.6 provides immunity even if the injuries were suffered by a non-target of the prosecution. *Id.* at 1211, 34 Cal. Rptr.2d 319.

Here, the search was part of the overall investigation concerning the theft of Larson's flashlight and is protected by the broad immunity of section 821.6. Plaintiffs' argument that the Court should limit section 821.6 immunity only to investigations that result in prosecutions is unpersuasive and unsupported by existing authority.

Plaintiffs correctly point out that to provide immunity to officers who conduct investigations that do not result in judicial proceeding may at times result in injustices. California courts, however, have accepted such a consequence. " '[I]n the end [it is] better to leave unredressed the

---

**23.** At the hearing, Plaintiffs argued that the Court should disregard the holding in *Amylou* and apply a narrow interpretation of *Sullivan v. County of Los Angeles*, 12 Cal.3d 710, 719– 722, 117 Cal.Rptr. 241, 527 P.2d 865 (1974) (holding that section 826.1 is limited to claims of malicious prosecution and does not apply to claims of false arrest), and *Asgari v. City of Los Angeles*, 15 Cal.4th 744, 752, 63 Cal. Rptr.2d 842, 937 P.2d 273 (1997) (same). Such a narrow application of section 821.6 is unfounded. First, the California Supreme Court case which section 821.6 codified stated: "When the duty to investigate crime and to institute criminal proceedings is lodged with any public officer, it is for the best interests of the community as a whole that he be protected from harassment in the performance of that duty. The efficient functioning of our system of law enforcement is dependent largely upon the investigation of crime and the accusation of offenders by properly trained officers. A breakdown of this system

at the investigative or accusatory level would wreak untold harm." *White v. Towers*, 37 Cal.2d 727, 729, 235 P.2d 209 (1951). Moreover, several courts have rejected such a narrow application of section 821.6. *See, e.g., Randle v. City and County of San Francisco*, 186 Cal.App.3d 449, 456, 230 Cal.Rptr. 901 (1986) (holding that while section 821.6 is principally used to immunize Defendants from malicious prosecution claims, it is not limited to that use, and that *Sullivan* should be narrowly read to prohibit section 821.6 in false arrest claims only); *Jenkins v. County of Orange* 212 Cal.App.3d 278, 283, 260 Cal. Rptr. 645 (1989) (holding that section 821.6 is not limited to claims of malicious prosecution and listing several other California Court of Appeal cases which have also held that section 821.6 is not limited); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1381 (9th Cir. 1998) (holding that section 821.6 protects officers from claims of negligence in their investigations which lead to an arrest).

wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" *Id.* at 1213, 34 Cal.Rptr.2d 319 (quoting *Hardy v. Vial,* 48 Cal.2d 577, 583, 311 P.2d 494 (1957)).

Moreover, the distinction that Plaintiffs request itself poses dangers. Whether an investigation leads to an actual formal proceeding bears no relation to the underlying injury. *See Ingram v. Flippo,* 74 Cal. App.4th 1280, 1293, 89 Cal.Rptr.2d 60 (1999) (finding that whether or not a prosecution was actually initiated in not a meaningful distinction). Plaintiffs' argument would permit an officer who severely intruded on a witness's rights during an investigation to enjoy immunity if, by chance, a suspect was apprehended and prosecuted; however, an officer who arguably infringed on a witness's rights would not enjoy immunity because a suspect was not apprehended and no prosecution ensued. If such a distinction were created, an officer would have an incentive to violate a person's rights drastically—for example, mistreat a witness who had potentially valuable information—to ensure that a prosecution would ensue and provide immunity for his unlawful actions. If Plaintiffs' distinction were to be adopted, there would also be an incentive for a police officer who has violated a person's constitutional rights to arrest and prosecute any suspect in order to enjoy immunity for the officer's prior illegal conduct.

Finally, Plaintiffs' textual argument fails because while the statute used the term "prosecution" of a "judicial" proceeding, California courts have interpreted these words broadly, such that the start of an investigation satisfies this requirement. *See id.* at 1210, 34 Cal.Rptr.2d 319.

Accordingly, while Defendant Schneider violated Plaintiffs' rights under state law, Defendant is immune from liability for Plaintiffs' state law claims. Also, while Defendants Scharf's and Del Rio's involvement are disputed, even if they were involved, they would be immune as well. Defendants, however, have not satisfied their burden that Defendant Thompson would enjoy immunity under section 821.6 because he is a private actor.[24]

### 3. Defendant City's Immunity Pursuant to Government Code § 815.2

California Government Code § 815.2(b) states as follows: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

In light of the Court's ruling as to Defendants Schneider's, Del Rio's, Scharf's immunity under section 821.6, Defendant City is immune from liability.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion is granted to the extent that it requests partial summary adjudication on liability against Defendant Schneider on Plaintiffs' § 1983 claim, and Defendant Thompson on Plaintiffs' California constitutional right to privacy and common law tort of intrusion claims. Plaintiffs' Motion is denied as to the remaining grounds. Defendants' Motion is granted to the extent it requests judgment on behalf of all Defendants except Defendant Thompson on Plaintiffs' state law claims. Defen-

---

**24.** The text of section 821.6 provides immunity for public employees only. Defendants have neither argued that Defendant Thompson is an employee of the City of Ontario, nor have they cited authority that section 821.6 provides immunity for private actors working at the direction of public employees.

dants' Motion is denied as to the remaining grounds.